[Civ. No. 13529. First Dist., Div. One. Mar. 17, 1948.]

Estate of STEWART EDWARD WHITE, Deceased. HAR-
WOOD A. WHITE, Appellant, v. MRS. LESLIE KIM-
MELL, Respondent.

Griffith & Thornburgh and John S. Baldwin for Appellant.

Leslie F. Kimmell and Frank V. Kington for Respondent.

BRAY, J.—Stewart Edward White, the well-known author, died testate. The portions of his will pertinent here are: article III, (h). "All of the remainder of the personal property included in my estate, such as furniture, rugs, manuscripts, mementoes, and articles of historical interest, with the exception of those herein specifically bequeathed and expressly excepting any and all securities, I give and bequeath unto my brother, Harwood White, of Ashley Road, Santa Barbara, California, and direct that he dispose of the same in such manner and to such persons as in his discretion he shall deem advisable, but preferably in accordance with any memorandum of instructions which I may leave at the time of my death. In the event it shall be found by my said brother and my executor that any of said articles of personal property may be sold, then I direct them so to sell such articles and to retain the proceeds thereof in my estate to be distributed in accordance with the terms hereof. . . . (k) To Mrs. Leslie Kimmel, . . . all unpublished manuscripts, to be handled by her in accordance with instructions which I have given her.''

The will was executed July 23, 1946. Decedent died September 18, 1946. For some time prior to and at the time of making his will, White had been engaged in writing a manuscript. Between the date of the will and of his death decedent completed the manuscript and sent it to respondent, the legatee under paragraph (k) above, who had worked with him in its preparation. She was to check it for errors and send it to the publisher. On September 10, just eight days before he died, decedent entered into an agreement with E. P. Dutton & Company, Incorporated, for publication of a book from the manuscript, the book to be called ''With Folded Wings.'' This contract provided for exclusive rights to the copyright and to publication in the publisher, with royalties to the decedent. Appellant is the brother of decedent, and the person mentioned in paragraph (h) above. About August 10, less than a month after the execution of the will and before the death of decedent, appellant discovered in the decedent's office a drawer in one of his filing cabinets labeled ''Unpublished Manuscripts.'' There is no evidence that the manuscript in question here was in the drawer at that time.

Appellant filed in the estate of decedent a petition for partial distribution asking that "all rights to the book, 'With Folded Wings' " be distributed to him under article III (h) of the will. Respondent filed an answer to that petition, setting up her claim to the manuscript and to the book, under article III (k), and asking that the title thereto be confirmed in her. After a hearing, the court found that the manuscript was an "unpublished" manuscript and as such was bequeathed to respondent under paragraph (k) of article III of the will, denied appellant's petition, and confirmed respondent's title to the manuscript and the book.

The real question is, did the testator intend that the bequest of "all unpublished manuscripts" should include "With Folded Wings." "The cardinal rule in the interpretation of a will is that 'it is to be construed according to the intention of the testator.' (Civ. Code, sec. 1317.) As said in the *Estate of Young,* 123 Cal. 337, [55 P. 1011], 'the purpose of construction as applied to wills is unquestionably to arrive if possible at the intention of the testator, but the intention to be sought for is not that which existed in the mind of the testator but that which is expressed in the language of the will.' It is not the business of the court to say, in examining the terms of a will, what the testator intended, but what is the meaning to be given to the language which he used. Where the terms of a will are free from ambiguity, the language used must be interpreted according to its ordinary meaning and legal import and the intention of the testator ascertained thereby." (*Estate of Blake,* 157 Cal. 448, 458 [108 P. 287].) "The words of a will are to be taken in their ordinary and grammatical sense, unless a clear intention to use them in another sense can be collected, and that other can be ascertained." (Prob. Code, § 106.) "If a disputed word or phrase has a well-defined legal or popular meaning, the presumption is that the testator intended the expression to have this meaning; and this presumption will be given effect, unless an intention to use the term in another sense is disclosed by the context of the will, the matter to which the word refers, or the draftsman's understanding as to the meaning of the expression." (26 Cal.Jur. p. 887.)

Under the above rules, what is the meaning of "unpublished"? Webster's New International Dictionary (1946) defines "publish" as follows: "3. To bring before the public,

as for sale or distribution; esp.: a. To print, or cause to be printed, and to issue from the press, either for sale or general distribution, as a book, newspaper, piece of music, engraving, etc. . . . PRINT, PUBLISH are often confused. A book may be *printed* without being *published;* it is *published* only when it is offered for sale, or put into general circulation; as 'Moxon told me . . . that he was about to *print* but (I think) not to *publish,* those elegiacs on Hallam' (E. Fitzgerald) ; 'Sir William Drummond's late book about the Bible —*printed,* but not *published'* (Byron).'' 18 Corpus Juris Secundum states: ''Publication is the act of making public or known, as by offering for sale or distribution, the subject matter in question . . .'' (Headnote, § 13(1), p. 150.) ''Private circulation is not publication, but printing and offering for sale constitute publication, and exposure for sale constitutes a publication . . .'' (P. 151.) ''Mere printing in itself does not amount to a publication, for the obvious reason that a book may be withheld from the public after it has been printed.'' (P. 152.) ''A consignment of books to dealers with instructions not to sell or to offer for sale until a specified time is not a publication, but a sale after that time has arrived is a publication.'' (P. 153.) See, also, *In re Publishing Docket in Local Newspaper,* 266 Mo. 48 [187 S.W. 1174], and 34 Am.Jur. 446.

Admittedly the manuscript had not been printed, or even set up in type at the time of the death of the decedent, which, of course, is the effective date of the bequest. (*Estate of Babb,* 200 Cal. 252 [252 P. 1039].) Thus, taking the words of the testator in their ordinary and grammatical sense, ''With Folded Wings'' was an ''unpublished'' manuscript.

To escape the obviousness of this conclusion, appellant contends that because decedent maintained a drawer labeled ''Unpublished Manuscripts,'' his use of that language in the will meant that he intended only to include the manuscripts actually in the drawer at the time of his death. Decedent obviously was an intelligent man, and undoubtedly knew the meaning of the word ''unpublished.'' While he had to remove the manuscript from the drawer (if it ever was there) to contract and arrange for publication, that act would not require the conclusion that by so doing, he, contrary to the ordinary and legal definition, considered the manuscript published; and as said in *Estate of Blake, supra* (p. 459), ''It is not the business of the court to say, in examining the terms of a will, what the testator intended, but what is the meaning to be

given to the language which he used." The place where the manuscript was at the time of death was immaterial. Had decedent intended to make the restriction or limitation contended for by appellant, instead of saying "unpublished manuscripts," he would have said "all manuscripts in the drawer labeled 'unpublished manuscripts.'"

Appellant concedes that "The primary purpose of the court in construing any will must be to determine the testator's true intention," citing *Estate of Axelrod,* 23 Cal.2d 761 [147 P.2d 1], and other authorities. He also refers to the following quotation from *Estate of Hollingsworth,* 37 Cal.App. 2d 432, 435 [99 P.2d 599]: "A rule to be followed in the interpretation of the provisions of a will is that the testamentary instrument is to be examined with a view of discovering the decedent's testamentary scheme or general intention. The meaning of the particular words, phrases and provisions is to be subordinated to this scheme, plan or dominant purpose."

That decedent meant just what he said, that "unpublished" manuscripts were to go to respondent, is shown by the entire context of both paragraphs (h) and (k). In the bequest to respondent he gave her all unpublished manuscripts "to be handled by her in accordance with instructions which I have given her." Thus, a reasonable interpretation is that until a manuscript became actually a *published,* as distinguished from an *unpublished* manuscript, it was to be hers to handle.

In paragraph (h) appellant is given "the remainder of the personal property . . . , such as furniture, rugs, manuscripts, mementoes, and articles of historical interest, with the exception of those herein specifically bequeathed . . . " The will then goes on to direct that the above be disposed of, and that if any of this personal property can be sold, appellant is to sell it and distribute the proceeds as directed. From the above, it is evident that the use of the word "manuscripts," in connection with mementoes and articles of historical interest, as opposed to the use of the words "unpublished manuscripts" specifically bequeathed in paragraph (k), is consistent with an intent to give appellant only copies of manuscripts already published and apart from rights incident thereto. Decedent speaks of selling the articles, if they may be sold, and retaining the proceeds for the estate. He would not refer to *selling* royalties from a published manuscript or even an about-to-be published manuscript. As stated in 3 Page on Wills, page 46,

"A provision that personal property, of which a bequest was made, was to be sold, is said to show that testator did not intend that money should pass thereby." Reading the two subdivisions together, it appears that decedent intended his brother to have all manuscripts which had been published, while respondent was to receive the unpublished ones. To hold, as urged by appellant, that decedent intended only to bequeath respondent the manuscripts which he had segregated and marked as "unpublished" by placing them in the marked drawer is a tenuous and strained construction of the language used. Suppose decedent, the day of his death, had been examining one of the unpublished manuscripts which he kept in the drawer, and had left it in another room of his house, dying before he returned it to its accustomed place; it certainly could not be contended that such manuscript was not included in the bequest to respondent.

Appellant contends that the moment decedent sent the manuscript to his publisher and executed a contract for its publication, he removed the manuscript itself from the designation of "unpublished manuscript" which he himself used; and secondly, that he segregated the reproduction rights in the book from the mere physical manuscript by substitution of a valuable contractual asset; that all decedent retained was a right to the royalties. As to the second point, while this may be true as between decedent and his publisher, the manuscript itself did not pass into the category of a "published" manuscript.

Appellant cites *Stephens* v. *Cady*, 14 How. 528 (55 U.S. 565) [14 L.Ed. 528], and *American Tobacco Co.* v. *Werckmeister*, 207 U.S. 284 [28 S.Ct. 72, 52 L.Ed. 208], for the proposition that at common law the transfer of the manuscript of a book does not carry with it the right to print and publish the work, and contends that this rule supports his above contention.

However, this contention is answered by the following sections of the Probate Code: (§ 77) "An agreement made by a testator for the sale or transfer of property disposed of by a will previously made, does not revoke such disposal; but the property passes by the will, subject to the same remedies on the testator's agreement, for a specific performance or otherwise, against the devisees or legatees, as might be had against the testator's successors, if the same had passed by succession." (§ 78.) "Neither a charge or encumbrance placed by a testator upon property, previously disposed of by his will, for the

purpose of securing the payment of money or the performance of any covenant or agreement, nor a conveyance, settlement, or other act of a testator, by which his interest in any such property is altered, but not wholly divested, is a revocation of the disposal; but the property, subject to such charge or encumbrance, or the remaining interest therein, passes by the will.''

*Estate of Dwyer,* 159 Cal. 664 [115 P. 235], holds that while at common law the general rule is that a sale of devised property by an executory contract of sale is a revocation of the devise, our code provisions have modified the common law rule.

''Respondent's contention that the legacy given to appellant has been adeemed cannot be sustained. While it is true that ademption ordinarily applies to special and not to general legacies (28 R.C.L. 344), it is only accomplished when a change with respect to the subject matter takes place which results in the satisfaction or abolishing of the gift. In *Estate of Mc-Laughlin,* 97 Cal.App. 485, 488 and 490 [275 P. 875], it is said:

'' 'In 3 Woerner's Law of Administration, 1523, section 446, it is said a legacy is adeemed when, by some act of the testator the thing devised has ceased to exist in the form in which it is described in the will, for the reason that, upon the death of the testator, there is nothing answering the description of that property which may be delivered to the legatee . . . In 40 Cyc. 1046, section C, it is said: ''The weight of authority is to the effect that a change, subsequent to the making of the will, in the form of property devised or bequeathed does not prevent the operation of the provisions of the will and the property in its changed form passes to the devisee or legatee.'' ' '' (*Estate of Cline,* 67 Cal.App.2d 800, 805 [155 P.2d 390].)

''There is no doubt that apart from statute the law recognizes certain rights of property in the original intellectual products of an author, which are entitled to the same protection as rights in any other species of property; that the author has the right of first publication and that such right is transferable. [Citing cases.]'' (*Loew's Incorporated* v. *Superior Court,* 18 Cal.2d 419, 421 [115 P.2d 983].) ''It is governed by the same rules of transfer and succession, is protected by the same process, and has the benefit of all the remedies accorded to other personal property so far as applicable.'' (18 C.J.S. 139.) ''The owner of any product of the mind, or of any

representation or expression thereof, may transfer his property in the same.'' (Civ. Code, § 982, as of 1946.) ''The right and property of an owner in a copyright may be bequeathed by will.'' (18 C.J.S., 1947 pocket part, vol. 18, Copyright and Literary Property, § 85.)

At least until publication, the common law right to first publication, and the rights incident thereto, existed concurrently with the manuscript and passed to respondent under paragraph (k), by virtue of Probate Code, sections 77 and 78, subject, of course, to whatever rights Dutton & Company had against the decedent by reason of the contract.

Appellant contends that on execution of the contract, decedent then held two distinct property interests, first, the contract right to the royalties, and secondly, the right as the author to the physical document constituting the original manuscript. Assuming this to be true, it does not alter the interpretation of paragraph (k). The manuscript had not yet become a ''published'' one, and therefore went to respondent, and by implication carried with it the right to the royalties. ''Bequests by implication have from remote times been sustained where no direct language in a will is found to support them but where from informal language used such reasonable construction can be placed on it as implies an intention to make a bequest. As said in 29 Am. and Eng. Ency. of Law, p. 382: 'Implication may arise under a recital, reference of elliptical expression which necessarily implies something else as contemplated by the testator; from the form of the gift; or from a direction to do something which cannot be carried into effect without of necessity involving something else as a necessary consequence.'

''While, of course, conjecture and speculation cannot be indulged in to import into the will of a testator something which no language used by him warrants simply because he seems to have omitted something which it is reasonable to assume should have been provided for, still when he has used language which can be reasonably interpreted to raise a devise, it should be so construed.'' (*Estate of Blake, supra* [157 Cal. 448, 466-7].)

Taking the words of the will in their ordinary and grammatical sense, the words ''unpublished manuscripts'' can only be given the meaning adopted by the lower court, namely, a manuscript which has not yet been published, even though contracted to be published. *Estate of Hartson*, 218 Cal. 536,

[24 P.2d 171], is cited by appellant to the effect that ''It is also well settled that where the provisions of a will are capable of two interpretations, under one of which those of the blood of the testator will take, while under the other the property will go to strangers, the interpretation by which the property goes to those of the blood of the testator is preferred.'' (P. 539.) This, of course, assumes that the clause is susceptible of two fairly equal interpretations. However, to give a construction favorable to the brother, appellant here, would require a very strained, technical and unwarranted interpretation of simple words used by a person skilled in the use of words calculated to convey ordinary, every-day meanings.

The order appealed from is affirmed.

Peters, P. J., and Ward, J., concurred.